**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEWARK PRE-SCHOOL COUNCIL, INC.,
Plaintiff and Counter-Claim Defendant,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants and Counter-Claim Plaintiffs.

Civil Action No. 16-01024 APM

**DEFENDANTS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Plaintiff, who is the counterclaim defendant, is a former provider of Head Start and Early Head Start services in Newark, New Jersey. It holds title to certain properties that were used to provide these services. There is a federal interest in these properties, i.e., federal money was used to purchase, renovate, and/or pay the mortgages on the properties. Because of the federal interest, plaintiff holds these properties in trust for the beneficiaries of the Head Start and Early Head Start programs (hereafter referred to as "Head Start"). See 45 CFR § 74.37. Plaintiff has breached its fiduciary duty as trustee by refusing to transfer title to the properties to a subsequent, interim provider of Head Start services in Newark (Community Development Institute, "CDI"). La Casa de Don Pedro, Inc. ("La Casa") will replace CDI on September 1, 2016, as the provider of Head Start services in part of Newark, and La Casa's use of five of plaintiff's facilities currently being used by CDI would ensure that Head Start services can be provided to all of the children in the area of Newark that are currently enrolled in the Head Start program.

In 2014, defendants issued disposition instructions to plaintiff directing it to transfer title to CDI pursuant to 45 C.F.R. § 74.32(c)(1)-(3); these instructions have been ignored. Had the instructions, which are based on the regulations governing the program, been followed, the current situation would have been avoided.

In an effort to temporarily resolve this issue and allow La Casa to use plaintiff's Head Start facilities, which are superior to the available alternatives, defendants proposed to plaintiff that an occupancy agreement be signed by La Casa providing that it would cover all operational expenses incurred by the facilities (including the appropriate percentage of mortgage payments associated with the facilities) that would otherwise have to be paid by plaintiff. This was rejected by plaintiff, who asserts that it is also entitled to "rent" payments for the use of the property, payments that are in excess of the operational costs. Plaintiff has been receiving such payments from CDI, but the rent payments should not have been made. The rent payments, which reduce the amount of money available for Head Start services, are in violation of plaintiff's obligation to hold the property in trust for the beneficiaries of Head Start. Defendant's counter-claim seeks the recovery of the rent payments in excess of operational costs under the unjust enrichment remedy. The rent-recovery issue is not, however, involved in this motion for preliminary relief.

In light of the above and pursuant to Fed. R. Civ. P. 65, defendants move for a temporary restraining order and a preliminary injunction requiring plaintiff to provide La Casa immediate access, subject to payment of operational costs by La Casa, to five of the properties held in trust by plaintiff (Sharpe James, Edna Thomas, Audrey West, St. Francis, and Academy) so that La Casa can use the properties to provide Head Start services to needy children beginning on September 6, 2016.

Attached hereto is a memorandum of points and authorities in support of this motion and a proposed order reflecting the requested relief.

Dated: August 5, 2016

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

BY: /s/ *Fred E. Haynes*
FRED E. HAYNES, D.C. Bar #165654
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4110
Washington, D.C. 20530
202.252.2550
fred.haynes@usdoj.gov

MICHAEL POSNER
Special Assistant United States Attorney
555 Fourth Street, NW.
Washington, D.C. 20530
202.252.2569
michael.posner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEWARK PRE-SCHOOL COUNCIL, INC.,
Plaintiff and Counter-Claim Defendant,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants and Counter-Claim Plaintiffs.

Civil Action No. 16-01024 APM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION**

Absent a temporary restraining order and a preliminary injunction, plaintiff Newark Preschool Council, Inc.'s refusal to relinquish title to certain properties in violation of federal regulation will imminently and directly cause serious injury to hundreds of young children in Newark who are in need of the quality early childhood services provided by Head Start and Early Head Start (hereafter, "Head Start"). Among other immeasurable harm, Head Start children and their families may lose access to social and psychological development opportunities, mental health services, formula, meals, and diapers.

**STATUTORY AND REGULATORY FRAMEWORK**

Through the Head Start program, HHS funds programs that provide comprehensive services to enhance the cognitive, social, and emotional development of poor children from birth to compulsory school age. See 42 U.S.C. §§ 9831 et seq. HHS awards grants to public and private agencies to provide Head Start services. See 42 U.S.C. §§ 9833, 9840a.

The Head Start Act authorizes the use of Head Start funds for the purchase, construction, and/or major renovation of facilities to be used to carry out Head Start programs. 42 U.S.C. §

9839(f)(1), (g)(2)(A) and (B). The Head Start Act also authorizes the use of Head Start funds to pay the cost of amortizing the principal and paying interest on loans incurred for the purchase, construction, or major renovation of facilities. 42 U.S.C. § 9839(f)(2), (g)(2)(A) and (B).

Pursuant to the Head Start Act at 42 U.S.C. § 9842(a), a grantee is required to keep records that fully disclose the amount and disposition of the proceeds of financial assistance given under the Head Start Act, as well as the portion of project costs supplied by non-Head Start sources. Furthermore, under the Head Start Act at 42 U.S.C. § 9842(c), a grantee is required to provide supporting documentation in connection with any HHS audit of Head Start operations.

HHS has promulgated regulations that govern Head Start. See 45 C.F.R. §§ 1301 et seq. Those regulations provide that the "Federal government has an interest in all real property and equipment acquired or upon which major renovations have been undertaken with grant funds for use as a Head Start facility." 45 C.F.R. § 1309.21(a). Head Start regulations define acquisition to include the purchase or construction of facilities in whole or in part with Head Start grant funds through payments made in satisfaction of a mortgage agreement (both principal and interest). See 45 C.F.R. § 1309.3. Moreover, facilities acquired with federal funds cannot be sold, otherwise transferred, or used as anything other than a Head Start facility without permission from HHS. 45 C.F.R. §§ 1309.21(b)-(c). Grantees that receive federal funds to acquire or make renovations to real property for use as a Head Start facility must file a Notice of Federal Interest in the appropriate official property records office reflecting the federal interest in the property. 45 C.F.R. § 1309.21(d)(2).

HHS also promulgated uniform administrative rules that apply to all institutions of higher education, hospitals, nonprofit organizations, or commercial organizations that receive HHS

awards through any federal program. See 45 C.F.R. §§ 74 et seq.[1] Those regulations provide that real property that is acquired or improved with federal funds must be held in trust by the recipient of the funds for the beneficiaries of the program under which the property was acquired or improved. 45 C.F.R. § 74.37. The recipients of funds used to acquire or improve real property must record appropriate notices that indicate the property was acquired, constructed or improved with federal funds, and that use and disposition conditions apply to the property. 45 C.F.R. § 1309.21(d)(2).

Significantly here, "[t]itle to real property shall vest in the recipient subject to the condition that the recipient shall use the real property for the authorized purpose of the project as long as it is needed." 45 C.F.R. § 74.32(a). "When the real property is no longer needed" as provided in 45 C.F.R. § 74.32(a), "the recipient shall request disposition instructions from the HHS awarding agency or its successor." 45 C.F.R. § 74.32(c). HHS must provide one or more of three disposition instructions: (1) permit the recipient to retain title without further obligation to the Federal Government after it compensates the Federal Government for the Federal Government's percentage of the current fair market value of the property; (2) direct the recipient to sell the property and pay the Federal Government for the Federal Government's percentage of the current fair market value of the property; and (3) direct the recipient to transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient shall be entitled to compensation for the recipient's attributable percentage of the current fair market value of the property. 45 C.F.R. § 74.32(c)(1)-(3).

---

[1] The Office of Management and Budget issued new uniform administrative requirements, cost principles and audit requirements that supersede the regulations at Part 74 and are effective for grant awards made on or after December 26, 2014. HHS' codification of the new regulations is contained in 45 C.F.R. Part 75. Part 74, rather than Part 75, governs here because all grants to NPC were awarded prior to December 26, 2014.

With respect to recordkeeping, grantees are required to maintain records that identify adequately the source and application of funds for Head Start activities, as well as accounting records that are supported by source documentation. See 45 C.F.R. § 74.21(b)(2), (b)(7); see also 42 U.S.C. § 9842(a) ("Each recipient of financial assistance under this subchapter shall keep such records as the Secretary [of HHS] shall prescribe, including records which fully disclose the amount and disposition by such recipient of the proceeds of such financial assistance, the total cost of the project or undertaking in connection with which such financial assistance is given or used, the amount of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.") In addition, as part of the process of closing out a grant that it received, a grantee must "account for any real and personal property acquired with HHS funds." 45 C.F.R. § 74.71(f).

## FACTS

a. OHS' Funding of NPC for Head Start Services

The Administration for Children and Families ("ACF") is an operating component of Defendant U.S. Department of Health and Human Services ("HHS"). Declaration of Carolyn Baker-Goode ("Baker-Goode Decl.") ¶ 1. The Office of Head Start ("OHS") is the component of ACF that is responsible for the administration of the Head Start and Early Head Start programs. Id.

Plaintiff Newark Preschool Council, Inc. ("NPC") is a former Head Start grantee that provided Head Start program services for the City of Newark service area, in both leased space and in facilities to which NPC currently holds title. Goode Decl. at ¶ 5. Historically, OHS automatically renewed Head Start grants each year, until the grantee relinquished the grant or OHS terminated the grant. Id. at ¶ 6. In 2007, the Head Start Act was amended to provide for a system referred to as a designation renewal system ("DRS"). Id. Under DRS, the Head Start Act

now requires that, rather than receive an automatic renewal, grantees identified as not providing high-quality services must compete in order to receive grants for a five year period. Id.; see also 42 U.S.C. § 9836(c).

During a review of NPC's Head Start program in 2012, ACF found and documented deficiencies in NPC's Head Start program. Id. at ¶ 7; Pl. Compl. Exhibit 2 (describing deficiencies). As a result of these deficiencies, OHS notified NPC on January 14, 2013 that it would have to compete for a new Head Start grant. Goode Decl. at ¶ 7; Pl. Compl. Exhibit 2. OHS notified NPC on February 8, 2013 that its indefinite grant would be extended to June 30, 2014 to accommodate the competition timeline. Goode Decl. at ¶ 8. OHS posted a funding opportunity announcement ("FOA") and received only two applications in response: Newark Public Schools and NPC. Goode Decl. at ¶ 9. A panel of non-federal experts reviewed the applications and did not select NPC's application for funding. Pl. Compl. Exhibit 3. OHS awarded a portion of the service area to Newark Public Schools as the only successful applicant and selected Community Development Institute Head Start Inc. ("CDI") as an interim grantee while it sought permanent replacement grantees for the remaining portion of the City of Newark service area. Goode Decl. at ¶¶ 9, 13. OHS informed NPC that its application was not selected by letter dated May 8, 2014. Goode Decl. at ¶ 10; Pl. Compl. Exhibit 3.

b. Transition of Head Start services to Community Development Institute ("CDI") and disposition instructions

In June 2014, OHS began the process of transitioning Head Start program services to CDI. Goode Decl. at ¶ 14. By letter dated June 13, 2014, OHS issued disposition instructions regarding the Properties. Id; Pl. Compl. Exhibit 5. These instructions directed NPC to take all action needed to ensure that title to the properties with federal interest could be transferred to CDI for the continued provision of Head Start services. Goode Decl. at ¶ 14; Pl. Compl. Exhibit

5. This letter also directed NPC to submit any records supporting its federal and non-federal contributions to OHS to facilitate calculation of the federal and non-federal percentage of the current fair market value of the properties. Goode Decl. at ¶ 14; Pl. Compl. Exhibit 5.

On July 1, 2014, OHS transferred the operation of NPC's Head Start program to CDI. Goode Decl. at ¶ 15. Because NPC had yet to transfer title to CDI as instructed, in July 2014 CDI executed a lease agreement with NPC for use of the Properties to avoid any disruption in the provision of Head Start services. Id. CDI utilized the Properties to provide Head Start services to 415 children and uses various other sites leased from other landlords to provide Head Start services to the remaining children in its service area. Id. OHS has funded CDI for the rental expenses for use of these properties. Id. at ¶ 16.

By letter dated January 15, 2016, OHS reiterated its disposition instructions and again directed NPC to transfer title to the Properties to CDI on or before February 1, 2016. Pl. Compl. Exhibit 8. OHS informed NPC that OHS could "no longer accept a delay in this [title transfer] process and is directing NPC to take all actions needed to transfer title to these properties" to CDI "for continued use by the Head Start program." Id. OHS further informed NPC that, "[d]espite being given numerous opportunities to submit documentation regarding the federal interest in and its cash non-federal contributions to these Properties, NPC to date has not established any compensable equity." Id. To date, NPC has not provided any source documentation of its financial contributions to the Properties. Goode Decl. at ¶ 19. NPC continues to refuse to relinquish title to the Properties. Id.

c. Federal funding provided for the acquisition, construction or improvement of the Properties

As a result of NPC's use of federal funds for the acquisition, renovation, or mortgage payments for each of the Properties, OHS has a federal interest in each of the Properties. Id. at ¶

17. In total, OHS has awarded at least $4,390,475 in federal funding for the acquisition, construction, and renovation of the Properties and payment of mortgages on the Properties. Id. at ¶ 39. More specific information on the federal funding for the Properties is set forth, by each property, in the exhibits to the Counterclaim.

In addition to the Notices of Federal Interest that NPC has filed for each of the Properties, each of which expressly acknowledges the use of Federal funds for the acquisition, construction, or improvement of one of the Properties, NPC has agreed that there is a federal interest in four of the seven Properties: Academy, Audrey West, St. Francis, and Central Kitchen. See Goode Decl. Ex. 8.

d. Transition of services to Las Casa de Don Pedro, Inc. ("La Casa") and the need for immediate rent-free access to the Properties

On September 23, 2014, OCH posted an FOA for the service area operated under CDI, which stated that OCH expected to issue three grant awards. Goode Decl. at ¶ 20. All applications were again evaluated and scored by a panel of non-Federal reviewers with expertise and experience in early childhood education and/or child development, family support services, or related fields. Id. NPC received the fourth highest score and was therefore not a preliminarily selected awardee. Id. OHS awarded grants to the top three scorers, one of which was La Casa, a non-profit organization. Id. at ¶ 28. La Casa was awarded its grant on June 20, 2016 to serve 405 Head Start children and 168 Early Head Start participants. Id.

With respect to the population to be served by La Casa, CDI has informed OHS that it has 279 children returning for Head Start services in September and 100 Head Start children newly enrolled for services in September. Id. at ¶ 36. Accordingly, at a minimum, La Casa needs space to serve 379 returning and newly enrolled Head Start children. Id.

La Casa needs immediate access to five of the Properties in order to be prepared to provide services to these 379 Head Start children by September 6, 2016. Id. at ¶ 37. Five of the preschool centers among the Properties (Sharpe James, Edna Thomas, Audrey West, St. Francis, and Academy) can accommodate 450 children in total. Id.

La Casa needs immediate access because, before providing services beginning on September 6, 2016, La Casa must obtain child care licenses from the State Department of Children and Families, which can take several weeks. Id. at ¶ 46. In addition, La Casa needs immediate access in order to plan its program operations. Id. Any delay in granting access may result in a delay of program operations that would harm hundreds of children who are vulnerable and most in need of Head Start services. Id.

La Casa does not have enough funding in its budget to pay the rent CDI has been paying to NPC for the Properties. Id. at ¶ 41. The amount La Casa has budgeted for potential rent of the five preschool centers is approximately $160,000 less than the amount CDI has been paying in rent. Id. If La Casa has to pay the same rent for the 5 preschool centers, it will be forced to reallocate its budget and reduce the services it could provide to the children and their families. Id. If La Casa does not have to pay rent for the use of the centers, this money could be used for additional Head Start services to children. Id.

OHS has identified alternate sites that are available for rent from other landlords for the provision of Head Start services, but these sites will reduce or eliminate the Head Start services available to enrolled children for a number of reasons. Id. at ¶ 48.

First, because the alternative sites are smaller, using the alternative sites would make La Casa ineligible for supplemental funding that the New Jersey State Department of Education provides, known as "Abbott funding." Id. This "Abbott funding" could be used to provide

enhanced services for the children such as longer hours of operation at the centers. Id. Second, not having to rent these alternate sites would result in a cost savings of approximately $894,000 per year for the Head Start program, which could also be used to provide services to additional children and more services and opportunities for children and their families. Id. at ¶ 43. Third, the leased sites are scattered geographically and some are in need repairs, making them difficult to manage and less cost-effective. La Casa may therefore relinquish its grant without access to the Properties because the alternative sites would not allow La Casa to run a high quality program. Fourth, these alternate sites can only accommodate 337 children. Id. at ¶ 44. Accordingly, if La Casa were forced to lease the alternate sites, 42 children who are enrolled in Head Start will not receive any programs. Id.

e. NPC is attempting to continue renting the Properties

NPC notified Program for Parents, a non-profit organization, that the Properties are available for rent effective September 1, 2016. Id. at ¶ 37. NPC requested that this organization circulate profiles of the facilities and have interested parties contact NPC's Executive Director. Id.

## LEGAL STANDARD

A party seeking a preliminary injunction "must establish (1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest." Elec. Privacy Info. Ctr. v. Dep't of Justice, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). "In conducting an inquiry into these four factors, '[a] district court must balance the strengths of the requesting party's arguments in each of the four required areas.' . . . If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak."

Id. (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir.2006)). Despite the flexibility of this test, "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." Chaplaincy, 454 F. 2d at 297.

"[W]here an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." Elec. Privacy Info. Ctr, 15 F. Supp. 3d at 39.

"The same standard applies to both temporary restraining orders and to preliminary injunctions." Council on Am.-Islamic Relations v. Gaubatz, 667 F. Supp. 2d 67, 74 (D.D.C. 2009) (quoting Chaplaincy, 599 F.Supp.2d 1, 3 n. 2 (D.D.C.2009)).

## ARGUMENT

It is clear that HHS will prevail on its counterclaim alleging that NPC is withholding title to the Properties in violation of federal regulations and that irreparable, very serious harm will occur to Head Start children if preliminary relief is denied, and the equities and public interest weigh in favor of preliminary relief. Accordingly, HHS satisfies the standard for issuance of a temporary restraining order and preliminary injunction here.

***(a) HHS is entitled to relief.***

HHS is entitled to relief on its counterclaim that NPC is withholding title to the Properties in violation of federal regulations.[2] The facts and governing regulations leave no room for dispute. The governing regulations make clear that the "Federal government has an

[2] HHS has asserted two other counterclaims—(1) that NPC has failed to maintain and produce records in violation of federal regulations; and (2) unjust enrichment—on which it is also likely to prevail. HHS pursues this preliminary relief based exclusively on its counterclaim that NPC is improperly withholding title to the Properties.

interest in all real property and equipment acquired or upon which major renovations have been undertaken with grant funds for use as a Head Start facility." 45 C.F.R. § 1309.21(a). Each of the Properties was acquired or improved with Federal funds. Supra at 6-7. Indeed, OHS has awarded at least $4,390,475 in federal funding for the acquisition, improvement, or mortgage payments for the Properties. Supra at 7. NPC has recorded Notices of Federal Interest that explicitly acknowledge NPC's use of HHS grant funds in connection with each of the Properties. See Defendants' Counterclaim at ¶¶ 25, 27, 28, 33, 34, 37 and accompanying Exhibits. In addition to filing these notices, NPC has subsequently agreed that there is a federal interest in four of the seven Properties: Centralized Kitchen, Academy, St. Francis, and Audrey West. See Good Decl. Ex. 8. A federal interest therefore exists in the Properties.

Once NPC was no longer a grant recipient, it no longer needed the Properties and was required by federal regulation to transfer their titles as directed by OHS. On January 14, 2013, OHS found deficiencies in NPC's Head Start Program, and so notified NPC that it would have to compete for a new Head Start grant, as required by federal regulation. See 45 C.F.R. § 1307.3(a) (requiring competition for funding if at least one deficiency is found during a review). Once NPC was required to compete for funding, a panel of non-federal experts reviewed the applications received and did not select NPC's application for funding. Supra at 9. Because the Head Start program services in Newark were therefore being transferred to another grantee, OHS issued disposition instructions regarding the Properties. Such disposition instructions are mandated by 45 C.F.R. § 74.32(c), since NPC was no longer a grantee and so no longer needed the Properties for use under the Head Start Program. 45 C.F.R. § 74.32(c) also gives OHS the right to direct a transfer of title to an eligible third party, which OHS did. See In re Southwest Citizens' Organization for Poverty Elimination v. U.S. Dept. Of Health and Human Services, 91

B.R. 278 (D.N.J. 1988) (affirming HHS's right to direct the transfer of automobiles purchased by a former Head Start grantee to another grantee). NPC has failed to comply with this directive—and therefore failed to comply with the governing regulations—***for over two years***. OHS reiterated its disposition instruction on January 15, 2016, nearly 7 months ago. Yet NPC continues to fail to comply with the Head Start program's governing regulations.[3]

The regulations make clear that once a recipient no longer needs to use a property for the Head Start program, as with NPC, OHS has the right to direct a transfer of title. The regulations do not allow a former grantee to continue to hold a property to make a profit exclusively as a landlord. To the contrary, real property that is acquired or improved with federal funds is held in trust by the grant recipients as trustee for the children beneficiaries of the Head Start program. 45 C.F.R. § 74.37. It is therefore clear that HHS is entitled to relief on its counterclaim that NPC has improperly withheld titles to the Properties in violation of federal regulations.

Even if HHS were somehow only likely to succeed on the merits—rather than clearly entitled to relief—the Court should still issue the injunction because of the very serious damage that will occur otherwise, as discussed below. See Elec. Privacy Info. Ctr, 15 F. Supp. 3d at 39 (under the heightened standard for a mandatory injunction, the moving party must show "clearly that he or she is entitled to relief ***or*** that extreme or very serious damage will result from the denial of the injunction." ) (emphasis added).

***(b) Very serious damage will occur if the injunction is denied.***

---

[3] NPC has failed to comply with the governing regulations in another way: by failing to produce any documentation to substantiate the compensation it may be entitled to under 45 C.F.R. §74.32(c). Grantees are required to maintain records that identify adequately the source and application of funds for Head Start activities and accounting records that are supported by source documentation. See 45 C.F.R. § 74.21(b)(2), (b)(7). To date, NPC has not provided any source documentation of its financial contributions to the Properties.

NPC's failure to comply with the governing regulations risks very serious damage to Head Start children in the near future. The party seeking injunctive relief generally must demonstrate that the claimed injury is "both certain and great" and that the alleged harm is "actual and not theoretical." Elec. Privacy Info. Ctr., 15 F. Supp. 3d at 44 (citing Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.Cir.1985)) (per curiam). Because HHS seeks a mandatory injunction, the applicable harm requirement "includes the need to demonstrate 'very serious damage in the absence of an injunction.'" Id. at 44 n. 7 (citing Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997)).

Moreover, a party seeking injunctive relief "must substantiate the claim [of] irreparable injury and must show that the alleged harm will directly result from the action which the movant seeks to enjoin." Id. at 44 (citing Columbia Hosp. for Women Found, 15 F. Supp. 2d at 4). Furthermore, the movant "must show that [t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (internal quotation marks omitted) (second and third alteration in original). Lastly, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" Id. (citing Chaplaincy, 454 F. 2d at 297).

Here, HHS has shown that NPC's failure to relinquish title will imminently result in very serious damage to Head Start children. La Casa does not have enough funding in its budget to pay the rent CDI has been paying to NPC for the Properties. Accordingly, even if La Casa is able to rent the Properties from NPC, it will be forced to reallocate its budget and reduce the services it can provide to the children and their families. Supra at 16. The alternative sites identified by OHS will not eliminate the harm. Use of these sites will make La Casa ineligible supplemental funding from the New Jersey State Department of Education, which could be used

to provide enhanced services for the children such as longer hours of operation at the centers. Moreover, these alternate sites can only accommodate 337 children. Accordingly, even if La Casa were still able to lease the alternate sites identified by OHS, there would still be insufficient space for 42 children who are already enrolled for Head Start services in September. Supra at 17.

Such reduced programing—or no programing altogether—is a serious and irreparable harm. See, e.g., Alvarez v. Fountainhead, Inc., 55 F. Supp. 2d 1048, 1051 (N.D. Cal. 1999)(finding possibility of irreparable harm where child would be excluded from benefits of preschool, including learning to play with peers, and no readily available alternative programs exist); Ross v. Disare, 500 F. Supp. 928, 934 (S.D.N.Y. 1977) ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury.")

In addition to missing the social and psychological benefits of preschool, the Early Head Start program provides children and their families with such essentials as medical and dental referrals, mental health services, behavioral and sensory screenings and other services critical to their development. Goode Decl. ¶ 45. In addition, the Head Start program provides two-thirds of the daily nutritional intake for a child. Id. It is unlikely that other pre-schools could be found to serve these children, and the parents of these children will be at risk of losing their employment if they cannot find suitable, cost free and available full day child care arrangements at this late date. Id. Parents would also lose access to critical parenting education opportunities that are provided by the Head Start program. Further, the reduced number of children being served means a reduction in the teaching staff. Id.

***(c) The equities and the public interest weigh in HHS's favor***

When "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." Elec. Privacy Info. Ctr., 15 F. Supp. 3d at 47 (citing Winter v. Nat. Resources Def. Council, Inc., 555 U.S. 7, 24 (2008)). "[C]ourts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (citing Winter v. Nat. Resources Def. Council, Inc., 555 U.S. 7, 24 (2008)).

Here, the equities and public interest weigh heavily in favor of preliminary relief. Granting the relief will ensure that 379 children will not have reduced or no Head Start services. The Head Start program was designed to promote school readiness for children in low-income families by providing comprehensive educational, health, nutritional, and social services. See 18 U.S.C. § 9831. Should NPC continue its 2-year-long failure to relinquish title as required by federal regulation and its pursuit of rent to which it is not entitled, 379 children will likely be deprived of the opportunity to obtain the full social and emotional development offered by the Head Start program. The effect on NPC would be its loss of the ability to profit as a landlord in contravention of federal regulation and in violation of its duty as trustee holding the property for the benefit of Head Start children. This effect also weighs heavily in favor of an injunction. Notably, NPC will not lose its ability to submit documentation to substantiate its financial interest in the Properties, something OHS has been asking NPC to do for two years.

## CONCLUSION

For the above reasons, Defendants respectfully requests that the Court issue an order pursuant to Fed. R. Civ. P. Rule 65(a) directing Plaintiff NPC to immediately provide non-party La Casa with access to the Properties, subject to payment of operational costs by La Casa.

Dated: August 5, 2016

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

BY: /s/ *Fred E. Haynes*
FRED E. HAYNES, D.C. Bar #165654
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4110
Washington, D.C. 20530
202.252.2550
fred.haynes@usdoj.gov

MICHAEL POSNER, NY Bar # 4923959
Special Assistant U.S. Attorney
555 Fourth Street, N.W., Room E-4110
Washington, DC 20530
(202) 252-2569
michael.posner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWARK PRE-SCHOOL COUNCIL, INC.,<br>Plaintiff and Counter-Claim Defendant, | |
| v. | Civil Action No. 16-01024 APM |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br>Defendants and Counter-Claim Plaintiffs. | |

**PROPOSED ORDER**

Upon consideration of Defendants and Counter-Claim Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiff's response thereto, and the entire record herein, it is hereby ORDERED that:

Defendants' motion is GRANTED; and

Plaintiff Newark Pre-School Council, Inc. is ORDERED to provide non-party La Casa immediate access, subject to payment of operational costs by La Casa, to the following five properties: Sharpe James, Edna Thomas, Audrey West, St. Francis, and Academy.

It is **SO ORDERED** this __________ day of________ 2016.

____________________
AMIT P. MEHTA
United States District Judge