## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
**Newark Pre-School Council, Inc.,** )
)
    **Plaintiff/Counterclaim Defendant,** )
)
        **v.** )    **Civil No. 1:16-cv-01024 (APM)**
)
**United States Department of Health** )
  **and Human Services, et al.,** )
)
    **Defendants/Counterclaim Plaintiffs.** )
—————————————————————— )

## MEMORANDUM OPINION

### I.    INTRODUCTION

This matter is before the court on Defendants/Counterclaim Plaintiffs United States Department of Health and Human Services (HHS) and the Secretary of HHS, Sylvia Mathews Burwell's (collectively "Defendants"), Motion for a Temporary Restraining Order and a Preliminary Injunction. HHS is the federal agency responsible for administering the Head Start program and its grant funding. Defendants seek to compel Plaintiff Newark Pre-school Council, Inc., to allow new Head Start grantee, La Casa de Don Pedro, Inc., access to certain properties owned and controlled by Plaintiff, in which the federal government has a property interest.

Upon consideration of Defendants' Counterclaim, the pleadings, the oral representations of counsel, and the evidence submitted, the court grants Defendants' Motion for a Temporary Restraining Order and a Preliminary Injunction.

## II.      BACKGROUND

### A.      Statutory and Regulatory Framework

#### 1.      The Head Start Program

The Head Start Program ("Head Start" or "the Program") was established in 1965. 42 U.S.C. § 9831 *et seq.* (2007).[1]  It is administered by the Office of Head Start, which is part of the Administration for Children and Families (itself a component of HHS).  Head Start awards grants to local public, non-profit, and for-profit entities—known as "Head Start Agencies" ("HSAs")—to provide "comprehensive child development services," with an emphasis on enabling preschool children to develop skills necessary to succeed in school.  *Id.*  To qualify as an HSA eligible for Head Start funding, an organization must meet certain minimum service requirements. 42 U.S.C. § 9836(d)(2).

Once an organization qualifies as an HSA, it is eligible to receive federal financial assistance for up to 80% of any Head Start project costs, with the other 20% acquired by the HSA from non-federal sources.  42 U.S.C. § 9835(b).  An HSA may use these grant funds only for federally approved activities, which include purchasing, constructing, financing, and renovating the facilities and equipment used by the HSA to provide Program services.  42 U.SC. §§ 9839(f)(1) and (2), (g)(2)(A) and (B).  The HSA is required to keep project cost records that track the use of federal funds, 42 C.F.R. §§ 74.219(b)(2) and (b)(7), and is required to provide those records upon request for periodic audits, *see* 31 U.S.C. § 7502 *et seq.* and Office of Management and Budget Circular A-133.  In addition to periodic audits, the Administration for Children and Families conducts quality reviews of each HSA in order to monitor the HSA's continued compliance with Program standards and will issue deficiency findings where appropriate.  42 U.S.C. § 9836a(c)(1) and (c)(2).  If an

---

[1] In 1995, Congress established "Early Head Start," which expanded the Program to include services for pregnant women and children under the age of three.  42 U.S.C. § 9840a (2007).

HSA is issued a deficiency finding, its grant is not automatically renewed at the end of the five-year grant period and the HSA must instead compete for renewal of grant funding.   45 C.F.R. § 1307.7(a).

2.   *HHS Head Start Act Regulations*

The parties' dispute centers on two regulations governing the procurement and disposition of real property used to provide Head Start services, 42 C.F.R. § 1309 and 45 C.F.R. § 74.   HHS regulation 45 C.F.R. § 1309 "prescribes the procedures for applying for Head Start grant funds to purchase, construct, or make major renovations to facilities in which to operate Head Start programs" and "also details the measures which must be taken to protect the federal interest in such facilities."   Under these regulations, the federal government retains an interest in all property "acquired"—defined to include the purchase or construction of facilities in whole or in part, *id.* § 1309.3—"or upon which major renovations have been undertaken" with Head Start funds, *id.* § 1309.21(a).   An HSA using federal funding for facility investments must file a Notice of Federal Interest, *id.* § 1309.21(d)(2), and may not sell or transfer the property without HHS' consent, *id.* § 1309.21(b) and (c).

Further, under 45 C.F.R. § 74 (2014),[2] all property either "acquired or improved with" HHS funding "shall be held in trust by the recipients as trustee for the beneficiaries of the project."   When such property is no longer needed for administering the federal program, HHS may order the grantee to, among other things, "transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the [grantee] shall be entitled to compensation for the [grantee's] attributable percentage of the current fair market value of the property."   *Id.*

---

[2] The Office of Management and Budget recently issued new uniform administrative requirements, cost principles, and audit requirements, which HHS codified as regulations in 45 C.F.R. Part 75, thus superseding Part 74.   The Part 74 regulations nevertheless apply here, as all grants awarded to Plaintiff were awarded when that Part was in effect. Plaintiff does not contend otherwise.

§ 74.32(c)(1)-(3).   In such cases, the former grantee is required to provide all financial records relating to the property "within 90 calendar days after the date of completion of the [grant]" such that HHS can deliver "prompt payments to a recipient for allowable reimbursable costs under the award being closed out."  *Id.* § 74.71

### B.    Factual Background and Procedural History

Plaintiff/Counterclaim Defendant in this case, Newark Pre-school Council, Inc., is a former HSA that provided Head Start services in the Newark, New Jersey, area from 1965 to 2014. *See* Pl.'s Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 31-32.   In 2012, as part of its required periodic quality review, the Administration for Children and Families ("ACF") documented deficiencies in Plaintiff's provided services.  *Id.* ¶ 33.  As a result of the findings, ACF informed Plaintiff, by letter dated January 14, 2013, that it would be required to compete for renewal of its Head Start funding.  *Id.* ¶ 37; Compl. Ex. 2, ECF No. 1-2.  Plaintiff then competed against other organizations for a new grant for the Newark service area, but was not selected as a grant recipient. Defs.' Counterclaim, ECF No. 7 [hereinafter Counterclaim], ¶ 20 & n.2.

As a result of losing its HSA status, ACF officials informed Plaintiff in a meeting held on June 9, 2014, that it would need to begin the process of closing out and transitioning its grant to the interim Head Start service provider, Community Development Institute, by the end of the 2014 school year.  Compl. ¶¶ 49-53; Counterclaim ¶ 22.  As part of the close out process, ACF issued disposition instructions pursuant to 45 C.F.R. § 74, by letter dated June 13, 2014, for seven properties that ACF asserted Plaintiff owned subject to a federal interest (the "Properties"). Compl. ¶¶ 54-56; Compl. Ex. 5, ECF No. 1-5.  The letter instructed Plaintiff to ensure that title for the Properties was transferred to Community Development Institute within 10 days for the continued provision of Head Start services and directed Plaintiff to submit any records supporting

4

its reimbursable interest in the Properties.  *Id*.  Plaintiff informed ACF that it disputed the federal interest in several of the Properties.  Compl. ¶ 57.  It also continued to control the Properties and, in an attempt to avoid any Head Start service disruptions during the course of the dispute, negotiated a lease agreement for the Properties with the interim service provider.  *Id*. ¶¶ 58-60. Since July 1, 2014, Community Development Institute has paid rent to Plaintiff for use of the Properties.  Counterclaim ¶¶ 44-45.

On September 23, 2014, ACF initiated a second competition for grant funding to provide Head Start programming in the Newark service area ("Second Grant Competition").  Compl. ¶ 66. Plaintiff again competed for the grant, and again it was not selected.  *Id*.  ¶¶ 67, 73; Counterclaim ¶ 46.  One of the winning grantees—which ACF named on June 20, 2016—was La Casa de Don Pedro, Inc.  Counterclaim ¶ 49.

During the Second Grant Competition, ACF and Plaintiff continued to discuss the disposition of the Properties.  Compl. ¶ 69.  On January 15, 2016, ACF sent a letter to Plaintiff reiterating its disposition instructions.  *Id*. ¶ 71; Compl. Ex. 8, ECF No. 1-8.  In that letter, ACF also informed Plaintiff that because it had not received any documentation supporting its interests in the Properties, Plaintiff had not established any compensable equity.  *Id*.  In the ensuing months, ACF and Plaintiff communicated several more times regarding the disposition of the Properties. By letter dated February 9, 2016, counsel for Plaintiff informed ACF that Plaintiff formally contested the federal interest in the Properties, even though it had recorded such interests as to all of them.  Compl. ¶ 72; Compl. Ex. 9, ECF No. 1-9, Counterclaim ¶¶ 24-37, Counterclaim Exs. 1-18, ECF Nos. 7-1-7-4.

Plaintiff filed its Complaint on May 31, 2016, at which point it still had not transferred title as to the Properties and retained control of them.  Plaintiff's Complaint alleged that the Second

Grant Competition was unfair and not an open competition and thus violated the substantive and procedural requirements of the Administrative Procedure Act.[3]  *See generally* Compl.

As of early August 2016, Plaintiff still retained title and control of the Properties. On August 5, 2016, Defendants filed a Counterclaim alleging that Plaintiff (1) had violated 45 C.F.R. § 74 by refusing to properly dispose of the Properties and provide the required documentation of its investments in the Properties, and (2) was unjustly enriched by rental payments paid by the interim provider for use of the Properties.  *See generally* Counterclaim. Defendants also filed a Motion for Temporary Restraining Order and for Preliminary Injunction. *See* Defs.' Mot. for Prelim. Inj., ECF No. 8 [hereinafter Defs.' Mot.].  The alleged urgency prompting Defendants' motion was the nearing start of the new school year, which is set to commence on September 1, 2016, and the need for the new service provider, La Casa, to gain access to and use five of the Properties to deliver Head Start services.  The court now turns to Defendants' Motion.

## III.   LEGAL STANDARD

Preliminary injunctive relief, of the kind requested here, is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations and internal quotation marks omitted).  A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  Specifically, a plaintiff must show: (1) that it "is likely to succeed on the merits"; (2) that it "is likely to suffer irreparable harm in the absence of preliminary relief";

---

[3] Plaintiff filed a Motion for a Preliminary Injunction on August 4, 2016, ECF No. 4, but subsequently withdrew that motion on August 18, 2016, ECF No. 16.

(3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted).

Courts in this Circuit traditionally have evaluated these four factors on a "sliding scale"— if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). The Supreme Court's decision in *Winter,* however, called that approach into doubt and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors have been convincingly established. *Compare Davis v. Billington,* 76 F. Supp. 3d 59, 63 n.5 (D.D.C. 2014) ("[B]ecause it remains the law of this Circuit, the Court must employ the sliding-scale analysis here."), *with ABA, Inc. v. District of Columbia,* 40 F. Supp. 3d 153, 165 (D.D.C. 2014) ("The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors." (citing *Davis v. Pension Benefit Guaranty Corp.,* 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring))).

Regardless of whether the sliding scale framework applies, it remains clear that a movant must demonstrate irreparable harm, which has "always" been "[t]he basis of injunctive relief in the federal courts." *Sampson v. Murray,* 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Indeed, if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors. *See*

*of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995) ("Because [the plaintiff] has made no showing of irreparable injury here . . . [w]e . . . need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction.").

Finally, the Court of Appeals has expressly cautioned that "[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted).  Heeding this caution, where, as here, the plaintiff's requested injunction is "mandatory—that is, where its terms would alter, rather than preserve, the *status quo* by commanding some positive act"—judges in this Circuit have required the moving party to "meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 & n. 2 (D.D.C. 2001) (holding that where "a ruling would alter, not preserve, the *status quo*," the plaintiff "must meet a higher standard than were the injunction he sought merely prohibitory," in light of the Supreme Court's holding that "'[t]he purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held'" (alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

Defendants' Motion is premised on the position that because Plaintiff is no longer a Head Start grant recipient—and is thus no longer an HSA—under the applicable regulatory scheme, it

is required to transfer title to the Properties to the successor grant recipient, La Casa.  *See generally* Defs.' Mot.  Although Defendants rely on the title-transfer regulations, a transfer of title is not the specific relief that they seek.  Instead, Defendants request the lesser interim relief of granting La Casa permission to occupy five of the Properties[4] rent-free and compelling Plaintiff to effect an immediate transfer of Plaintiff's state child-care licenses to La Casa.  *See* Defs.' Mot. at 19; Defs.' Status Report, ECF No. 14 [hereinafter Defs.' Status Report], at 3.

The court finds that Defendants have clearly demonstrated that they are likely to succeed on the merits.  Defendants' primary argument is that the Head Start regulations expressly authorize HHS to order Plaintiff, who is no longer a grant recipient, to transfer title of the Properties to La Casa.  Those regulations state, in pertinent part, that the federal government has "an interest in all real property . . . acquired or upon which major renovations have been undertaken with grant funds for use as a Head Start facility."  45 C.F.R. § 1309.21(a).  When the holder of title to such property no longer needs to use that property as a Head Start facility (*i.e.,* upon expiration or termination of its grant), HHS may order that title holder to "transfer title to the property to . . . an eligible third party provided that, in such cases, the [grantee] shall be entitled to compensation for the [grantee's] attributable percentage of the current fair market value of the property."  *Id.* § 74.32(c)(3).  Therefore, Defendants argue—and the court agrees—that this regulatory framework clearly grants HHS the authority to order Plaintiff to transfer title to the Properties to La Casa and that, as a result, Plaintiff's continued refusal to relinquish title to the Properties violates these regulations.  *See* Defs.' Mot at 13-15.

Plaintiff offers two unconvincing responses to Defendants' argument.  First, Plaintiff interprets 45 C.F.R. § 74 (c)—and specifically the phrase, "provided that, in such cases, the

---

[4] The five Properties are: Sharpe James, Edna Thomas, Audrey West, St. Francis, and Academy.

[grantee] shall be entitled to compensation"—to contain a condition precedent mandating full compensation of the title holder's equity interest in the property prior to ordering transfer of title. *See* Pls.' Opp'n to Mot. for Prelim. Inj., ECF No. 10, at 2-3. Thus, Plaintiff argues, Defendants cannot order the transfer of title to the Properties until Defendants fully compensate Plaintiff for its equity interest. *Id.* But Plaintiff's interpretation finds no support in the plain text of 45 C.F.R. § 74. That regulation does not require payment prior to the transfer of title. Rather, all that regulation does is secure, as a condition of transfer, the grantee's "entitlement to"—and not receipt of—compensation "for the recipient's attributable percentage of the current fair market value of the property." 45 C.F.R. § 74 (c)(1)-(3). To read the regulation the way that Plaintiff insists would lead to the discordant result that a former grantee could block transfer of a property to a successor grantee, and thus impede the delivery of services, until final compensation is received, even if that requires litigation to condemn the non-federal share of the property. *See* Draft Tr. of Oral Argument, August 15, 2016 [hereinafter Hr. Tr.] (discussing whether the regulatory framework requires HHS to initiate condemnation proceedings for the disputed property prior to granting access to successor grantee). In that case, the Head Start beneficiaries would suffer. The court will not read the Head Start regulations to permit a result so utterly at odds with the Program's purpose.

Second, the Plaintiff argues that the Uniform Real Property Acquisition Policy Act, 42 U.S.C. § 4651 [hereinafter the Acquisition Act], requires Defendants to follow an established procedure when ordering transfer of title, which includes obtaining an appraisal, establishing an amount of just compensation, negotiating with the landowner, and, if negotiations prove unfruitful, initiating formal condemnation proceedings. *Id.* at 3-4. Plaintiff claims that Defendants' interpretation of its regulations runs afoul of the procedure laid out in the Acquisition Act. *Id.* The

Acquisition Act does not, however, help Plaintiff. Congress expressly provided that the Acquisition Act "create[s] no rights or liabilities." 42 U.S.C. § 4602(a). And, consistent with Congress' expressed intent, courts have held that the Acquisition Act, "in imposing policies on the heads of federal . . . agencies . . . , creates no individually enforceable rights." *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 444 (4th Cir. 2014).

At the hearing on Defendants' motion, Plaintiff asserted for the first time that HHS has promulgated binding regulations effectively adopting the Acquisition Act and thereby committing the Secretary of HHS to its property acquisition procedural requirements. *See* Hr. Tr. Plaintiff's Opposition brief makes, at most, a passing reference to these regulations and Plaintiff failed to further refine its argument during the hearing. Nor have Defendants had the opportunity to brief that issue. The court, therefore, declines to consider that argument. *See United States v. Marshall*, 669 F.3d 288, 295 (D.C. Cir. 2011) (declining to consider argument raised for the first time at oral argument).

Accordingly, Plaintiff's continued refusal to transfer title to the Properties as requested by Defendants is in plain violation of 45 C.F.R. §§ 74 and 1301 and, as a result, Defendants have established a substantial likelihood of success on the merits.[5]

**B.      Irreparable Harm**

Defendants also have shown that they—or, more appropriately, the Head Start beneficiaries for whom they advocate, *cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel., Barez*, 458 U.S. 592, 607-08 (1982) (holding that the sovereign can bring a *parens patrie* action to protect the health and well-being of its residents)—are likely to suffer irreparable harm unless injunctive relief is granted. Currently, La Casa—even though it has been awarded the remaining portion of the

---

[5] The court notes that, although Plaintiff has claimed that some of its Properties are *not* subject to a federal interest, *see, e.g.,* Compl. ¶ 9, Ex. 9, Plaintiff has not offered any *evidence* at this juncture to support that assertion.

Head Start grant funding by Defendants—does not have unconditional access to the Properties. *See* Defs.' Mot at 10-11, Defs.' Status Report at 1.  La Casa requires immediate, unconditional access to the Properties in order to begin preparations for the new school year.  *See* Defs.' Mot. at 10-11.  If La Casa is not able to access the Properties, it will not be able to provide Head Start services for the nearly 400 children who rely on those services.  *Id.*

Plaintiff claims that it will not stand in the way of La Casa's entry to the properties and its efforts to provide Head Start services and thus Defendants cannot establish irreparable harm. *See* Pl.'s Status Report, ECF No. 15 [hereinafter Pl.'s Status Report], at 2.  But such a promise is not the same as a judicially-recognized legal entitlement to be on the properties.  And, importantly, Plaintiff has insisted that it receive compensation for the month of September.  *See id.*  Short of a binding order, the court has no way of enforcing La Casa's continued access to the Properties if Plaintiff is dissatisfied with whatever compensation it receives, if any.  Such an unstable situation is simply unacceptable and puts at risk the needs of hundreds of children.

In short, at present, La Casa's access to the Properties and its ability to provide Head Start services is entirely contingent upon the goodwill of Plaintiff, even though La Casa has the indisputable legal right to access those Properties.  The court is not willing to leave to the mercy of Plaintiff's good intentions the Head Start services relied upon by nearly 400 children and their families.  Accordingly, the court finds that Defendants will be irreparably harmed absent the requested injunctive relief.

### C.    Balance of Equities

Plaintiff will suffer little to no discernable harm by the court's grant of injunctive relief. Plaintiff has wrongfully refused to transfer title to the Properties as it is required to do under the applicable regulations and will, at most, suffer unreimbursed operational costs associated with

effecting the transfer to La Casa as a result of the court's order.  Thus, the balance of equities decidedly weighs in favor of Defendants.

### D.      Public Interest

Granting injunctive relief also is clearly in the public interest.  The public, which includes the families and communities of the Head Start children at issue in this case, has a powerful interest in the effective promotion of school readiness for children in low-income families.  The Head Start program, which endeavors to promote these goals through the provision of comprehensive educational, health, nutritional, and social services to children from low-income families, reflects this public interest.  The interest of the public thus favors injunctive relief.

* * *

The parties have raised the issue of whether and to what extent Plaintiff is entitled to receive a payment for the month of September.  *See generally* Defs.' Status Report, Pl.'s Status Report. According to Plaintiff, a one-time payment of $85,000 "will assist in a smooth transition and timely commencement of the school year."  Pl.'s Status Report at 2.

Leaving aside the heavy-handed quality of Plaintiff's demand, Plaintiff has offered no legal justification to insist on receiving such a payment.  On the contrary, the Head Start regulations are replete with restrictions on Plaintiff's ability to use or encumber the Properties *in any way* absent HHS approval.  *See, e.g.*, 45 C.F.R. § 1309.21(b) and (c) (property with Federal Interest may not be "mortgaged" "used as collateral" "sold" or "transferred" without HHS approval), 45 C.F.R. § 74.37 (property with Federal Interest is "held in trust" "for the [Head Start] beneficiaries" and "shall not be encumbered without" HHS approval).  In the current context, Plaintiff should be taking all reasonable and necessary steps in order to ensure an orderly transition to La Casa, including transferring the necessary child-care licenses.

The court will leave it up to the parties to determine how and by whom the operational costs will be paid to ensure a smooth transition.  However, to the extent that the Plaintiff remains the obligor for any payments due on the Properties, such as the mortgage or utilities, the court urges Plaintiff to fully cooperate with both the Defendants and La Casa to ensure timely payments.

V.    **CONCLUSION**

Based upon the foregoing, the court grants Defendants' Motion for a Temporary Restraining Order and a Preliminary Injunction.  Accordingly, Plaintiff is hereby ordered:

1.    To provide La Casa immediate access, subject to the payment of operational costs by La Casa, to the following five Properties:  Sharpe James, Edna Thomas, Audrey West, St. Francis, and Academy; and,

2.    To immediately transfer the child-care licenses to La Casa to ensure that La Casa is able to deliver Head Start services beginning on September 6, 2016.

Dated:  August 19, 2016                     Amit P. Mehta
                                            United States District Judge